2012 VT 15A

## John Doe v. Vermont Office of Health Access

[54 A.3d 474]

No. 11-045

Present: Reiber, C.J., Dooley, Skoglund and Burgess, JJ., and Cook, Supr. J. (Ret.)[1], Specially Assigned

Opinion Filed June 14, 2012

[1] Judge Cook was present for oral argument, but did not participate in this decision.

518

*Karen McAndrew* and *Linda J. Cohen* of *Dinse, Knapp & McAndrew, P.C.*, Burlington, for Plaintiff-Appellee/Cross-Appellant.

*William H. Sorrell*, Attorney General, and *Mark J. Di Stefano*, Assistant Attorney General, Montpelier, for Defendant-Appellant/Cross-Appellee.

¶ 1. **Reiber, C.J.** John Doe, a Medicaid recipient, and the State appeal the trial court's decision allowing the State to partially recover the amount of its lien against Doe's settlement with a third party. The trial court calculated the State's reimbursement pursuant to *Arkansas Department of Health & Human Services v. Ahlborn*, 547 U.S. 268 (2006). We affirm in part, and reverse and remand in part.

¶ 2. The underlying facts are undisputed. In 1992, when Doe, a Vermont resident, was nine years old, he was catastrophically injured and paralyzed in an automobile accident. He was riding in the back seat of the family car when it left the New York Thruway and went down an embankment. The portion of the

Thruway on which the accident occurred was supposed to have guardrails to prevent cars from going down the embankment. The New York State Thruway Authority (NYSTA) had previously contracted for the rails to be installed but, for whatever reason, they were not. Due to Doe's injuries, his mother applied for Medicaid on his behalf in 1994. Doe later brought suit in New York Supreme Court against alleged third-party tortfeasors. He also sued NYSTA in the New York Court of Claims. The State of Vermont notified Doe in January 2001 that it claimed a lien against any award, judgment, or settlement stemming from the accident.

¶ 3. In July 2001, Doe settled the lawsuit against the third parties for $8.75 million. The State had spent $894,893.11 in medical expenses for Doe at that point, and at the time of settlement the State and Doe communicated about Doe's obligation to reimburse the State. The parties came to agreement, and Doe paid the State $594,209.03 from the proceeds of the 2001 settlement.

¶ 4. The substance of *Ahlborn* and the structure of federal Medicaid law are important to understand before proceeding. The Medicaid program provides joint federal and state funding of medical care for those who cannot afford their own medical costs. *Ahlborn*, 547 U.S. at 275. Medicaid was launched in 1965 and is administered by the United States Secretary of Health and Human Services (HHS), who exercises authority through the Centers for Medicare and Medicaid Services (CMS). *Id.* All states participate in the Medicaid program, though they are not required to do so. *Id.* Vermont is a participant, see 33 V.S.A. §§ 1901-1910, and has in place a statute regarding liens against proceeds from third parties for medical expenses, see *id.* § 1910. At the relevant time, this statute provided that the Office of Vermont Health Access (OVHA) "shall have a lien against a third party, to the extent of the amount paid by the agency, on any recovery for that claim, whether by judgment, compromise or settlement." *Id.* § 1910(a).[2]

---

[2] The trial court noted that, in 2008, after suit was filed, this statute was amended. See 2007, No. 192 (Adj. Sess.), § 6.014. Because it did not specify a different effective date, it became effective on July 1, 2008. See 1 V.S.A. § 212. The court correctly concluded, therefore, that the amendments did not affect this case, citing 1 V.S.A. § 213. This is not at issue on appeal.

■ ■ ¶ 5. Both the states and the federal government pay a portion of Medicaid costs, with the federal government paying between fifty and eighty-three percent of costs incurred for patient care. *Ahlborn*, 547 U.S. at 275. Each state must comply with federal requirements. One of these requirements is that the state in charge of Medicaid must "take all reasonable measures to ascertain the legal liability of third parties . . . to pay for care and services available under the plan," 42 U.S.C. § 1396a(a)(25)(A), and if liability is found, the state must "seek reimbursement for such assistance to the extent of such legal liability," *id.* § 1396a(a)(25)(B). Each state must also require individuals to "assign the State any rights . . . to support . . . and to payment for medical care from any third party." *Id.* § 1396k(a)(1)(A). These provisions together are known as the reimbursement and assignment provisions. Their purpose was to ensure that states could recover payments made on behalf of Medicaid recipients, and thus to prevent recipients from "receiv[ing] a windfall by recovering medical expenses they did not pay." *Tristani ex rel. Karnes v. Richman*, 652 F.3d 360, 370 (3d Cir. 2011). Also of significance is the anti-lien requirement, which provides that "[n]o lien may be imposed against the property of any individual prior to his death on account of medical assistance paid or to be paid on his behalf under the State plan." 42 U.S.C. § 1396p(a)(1). The anti-lien provision was incorporated into the Social Security Act in 1960, in order to insulate the personal assets of Medicaid recipients during their lifetimes. *Richman*, 652 F.3d at 371-72.

■ ¶ 6. In *Ahlborn*, the U.S. Supreme Court addressed the interplay between the reimbursement and assignment provisions and the anti-lien provision. The Court held that states may claim a lien only on that portion of settlement proceeds that represents payment for medical expenses. 547 U.S. at 284-85. The plaintiff in *Ahlborn* was injured in a car accident and became eligible for Medicaid, which paid providers on her behalf. *Id.* at 272-73. When the plaintiff settled with a third party for damages totaling $550,000, the Arkansas state agency administering Medicaid asserted a lien in the amount of $215,645.30. *Id.* at 274. The agency claimed a right to recover its lien against all damages for which recovery was paid on behalf of the plaintiff, which included damages for permanent physical injury, future medical expenses, past and future pain, suffering, and mental anguish, past loss of earnings, and permanent impairment of the ability to earn in the

future. *Id.* at 274, 278. The Arkansas statute allowed the state to impose a lien in an amount equal to the state's Medicaid costs. *Id.* at 272. The parties stipulated that the plaintiff's entire claim was worth approximately $3 million, that the settlement was approximately one-sixth of that amount, and that the agency would therefore be entitled to only $35,581.47 if the Court held that the state could not recover more than the portion of the settlement representing payments for medical care. *Id.* at 280-81.

¶ 7. The Court looked to the statutory scheme governing Medicaid and reasoned that the anti-lien provision places "express limits" on a state's right to reimbursement. *Id.* at 283. It held that a state may not claim more than the portion of a settlement representing medical expenses; in other words, the anti-lien provision prohibits recovery of payments for damage items other than medical costs. *Id.* at 284.[3] The Court invalidated the Arkansas statute allowing for an automatic lien on settlements in an amount equal to all Medicaid costs. *Id.* at 292.

¶ 8. In this case, Doe's suit against NYSTA went to trial, and the court concluded that NYSTA was negligent and that its negligence caused Doe's injuries. The Court of Claims engaged in a two-step process, through successive hearings, to determine damages. First, in 2004, the Court of Claims awarded Doe approximately $42 million and allocated approximately $2.9 million to Doe's past medical expenses from the date of injury to the date of trial. Then, in 2005, the Court of Claims held a New York Civil Practice Law and Rules (C.P.L.R.) Article 50-B hearing to convert the damages award into payments for Doe and his attorney. See N.Y.C.P.L.R. § 5041 (setting forth procedure for structuring payments to plaintiffs in personal injury cases). NYSTA appealed, and in 2006, while the appeal was pending, the parties reached a settlement in the amount of $12 million. Like the earlier settlement with third parties, this settlement did not identify the portion of the total damages attributable to past medical care.

---

[3] The plaintiff in *Ahlborn* did not argue that all Medicaid liens are inconsistent with the anti-lien provision, but rather that a state cannot assert a lien on the portion of a settlement representing damages for items other than medical care. *Id.* Thus, the Court assumed without deciding that the reimbursement provision is an exception to the general prohibition in the anti-lien provision, which allows states only to "encumber[] proceeds designated as payments for medical care." *Id.*; see also *Richman*, 652 F.3d at 363 n.3 (characterizing *Ahlborn* as assuming without deciding that "liens limited to medical costs are an implied exception to the federal law prohibiting liens on the property of Medicaid beneficiaries").

Between the 2001 and 2006 settlements, the State paid approximately $771,111 in medical expenses for Doe's care, in addition to the medical expenses paid up to the date of the first settlement. The State claimed a lien on the 2006 settlement for $506,810, which is the difference between the amount the State paid for Doe's medical care under Medicaid and the State's share of litigation expenses.

¶ 9. Doe sued the State of Vermont, seeking a declaratory judgment that he satisfied the State's lien by partial payment. Doe argued that the State recovered approximately $70,000 above the amount of its legally permissible lien out of the 2001 settlement for which he claimed a set-off. Doe urged the court to treat the 2001 and 2006 settlements together and to use the Court of Claims' 2004 opinion and allocations of the various elements of damage to determine the portion of the settlement that was for medical expenses. The State argued that it was entitled to recover an additional $506,810 out of the 2006 settlement, the full amount of its asserted lien. It contended that the court could not reexamine the 2001 settlement and that, with regard to the 2006 settlement, the court should have held a new hearing to determine which portion of the settlement constituted medical expenses, rather than adopting the Court of Claims' figures. The parties also disagreed as to how to use the Court of Claims' findings regarding damages, if the court adopted them.

¶ 10. On summary judgment, the court concluded that it would not undo the 2001 settlement because it was an accord and satisfaction of all claims paid for medical expenses incurred to that point in time. That is, in exchange for the State's agreement not to seek additional reimbursement, Doe paid the State $594,209.03. As for the 2006 settlement, the court held that the Court of Claims' 2004 damages award could be used to determine medical expenses and an allocation hearing was unnecessary. In making the allocation, the court thus used the Court of Claims' judgment — its findings on Doe's damage claims — and calculated the lien as follows. It approximated the ratio between the amount of medical expenses the State paid between the 2001 and 2006 settlements and the total amount of medical expenses paid by the State through the 2006 settlement. It found that approximately 46% of the State's expenditures occurred between the settlements. The court then took 46% of the $2.9 million for past medical expenses as determined in the Court of Claims' decision,

and concluded that approximately $1.3 million in medical expenses was spent between the 2001 and 2006 settlements. Then the court calculated that the $1.3 million attributable to medical expenses was approximately 3.17% of the total $42 million award. The court applied 3.17% to the $12 million sum from the 2006 settlement, and concluded that the State was owed $380,758.14 on its lien. That number was smaller than the amount the State sought, and the court concluded that the State could not recover the excess. In deciding a motion to amend its judgment, the court deducted $3,586.68 from the award, the State's share of reasonably necessary costs and expenses, and entered judgment for the State in the amount of $377,171.46.

¶ 11. The State argues that the trial court should have reduced the Court of Claims' findings of future economic damages to present value before making its lien allocation. In essence, the State complains that the trial court's allocation percentage of 3.17% was unfair because the numerator represented actual expenses, but the denominator included future expenses not discounted to present value. Doe's cross-appeal contends that the trial court erred because it attached the State's lien to all past medical expenses, including those paid by him and his family, and failed to account for the attorney's fees. In addition, Doe argues that the court erred in concluding that the 2001 settlement was an accord and satisfaction and could not be reconsidered in determining the amount of the State's recovery from the 2006 settlement.

¶ 12. We review questions of law de novo without deference to the trial court. *Vt. Alliance of Nonprofit Orgs. v. City of Burlington*, 2004 VT 57, ¶ 5, 177 Vt. 47, 857 A.2d 305. We review the trial court's decision de novo on appeal from summary judgment. *Nordlund v. Van Nostrand*, 2011 VT 79, ¶ 9, 190 Vt. 188, 27 A.3d 340.

I.

¶ 13. The State contends that, "[a]s a matter of law, future economic damages in tort cases must be reduced to present value." The State notes that it presented "specific evidence" that the majority of damages found by the New York court were not discounted and that, under New York law, future damages awards are often reduced to present value after damages findings are made. Even if reduction to present value is not required as a

matter of law in all cases, the State argues that the trial court abused its discretion by declining to do so in this instance.

¶ 14. The State points to the fact that approximately $34 million out of the total $42 million award was attributable to future medical expenses and future loss of earnings. According to the State, the trial court's analysis inflates overall damages in proportion to past medical expenses. That is, the State argues that the court compared and equated expenditures of a dollar in the past with expenditures of a dollar far in the future, ignoring the fact that the future dollar will be worth less. The State contends that future economic losses should have a present day value of approximately $10.5 million, rather than approximately $34 million.

¶ 15. Doe argues in response that the discounting issue was not timely raised in the trial court. Both the trial court and Doe note that the State did not make the argument until "very late in the summary judgment process" in a surreply brief. The State argues that it was entitled to present one formula without a present value component in support of its motion for summary judgment, and later argue that damages must be discounted in its opposition to Doe's cross-motion for summary judgment. The court went on to conclude that it would not perform a present value calculation anyhow, reasoning that, although post-*Ahlborn* authorities require the trial court to make a fair allocation, no court has held that all allocations must include a reduction of damages to their present value. Thus, because we conclude that the trial court ruled on the issue below, we will review whether reduction to present value is appropriate, regardless of when the issue was raised. See *In re Barry*, 2011 VT 7, ¶ 29, 189 Vt. 183, 16 A.3d 613.[4]

¶ 16. Although *Ahlborn* held that states are limited to the portion of a settlement that represents medical costs paid by

---

[4] Doe also contends that an amalgam of the Court of Claims' ordered payments, including discounted figures, eclipses the $42 million figure, thereby rendering the trial court's use of the $42 million figure harmless error. Doe adds the lump sum payment of approximately $11 million — past damages and a small portion of future damages — and $25 million — the total present value of Doe's future damages — to reach approximately $36 million, after the 2001 settlement is backed out. We decline to affirm solely on this ground because it rests largely on guesswork and furthermore would require us to carefully scrutinize the Court of Claims' decision and the manner in which a New York court enters a structured judgment. We do note, however, that the Court of Claims' final judgment significantly undercuts the State's understanding of the present value of the New York judgment under 50-B.

Medicaid, it did not provide concrete guidance on how those allocations should be made. The State cites a U.S. Court of Appeals case to support its claim that future damages must be reduced to present value. In *Price v. Wolford*, 608 F.3d 698 (10th Cir. 2010), the plaintiffs sued their doctor, alleging negligence during the delivery of their child. *Id.* at 700. Plaintiffs' expert estimated that total damages were $12 million, and the parties later settled for $1.1 million. *Id.* at 701. The court held that the plaintiffs admitted no statement or report containing the $12 million figure into evidence below, and the figure was apparently not in the lower court's record. *Id.* at 708. Furthermore, after reviewing the report which proposed $12 million in damages, the court concluded that the report would be "vulnerable to nontrivial challenges" for two reasons: the $12 million figure was not discounted to present value, and "more importantly," the calculations assumed a life expectancy not supported by the evidence. *Id.* The State argues that *Price* held that "an *Ahlborn* allocation calculation will not be fair if the future economic damages components have not been converted to present value."

■ ■ ¶ 17. *Price* indicates that discounting to present value may be appropriate in some instances, but it does not go so far as to say that discounting is required. We find no support for the proposition that, as a matter of law, future damages must be reduced to present value in Medicaid lien cases. We do agree with the State that a reduction to present value is generally appropriate for economic damages, but not noneconomic damages. See *Levine v. Wyeth*, 2006 VT 107, ¶ 42, 183 Vt. 76, 944 A.2d 179. This is, however, not the appropriate case for discounting. To begin, the differential between the parties' figures is colossal. Doe presents a damages figure of $42 million to be used in making the allocation, while the State presents a figure of approximately $18 million. The State simply did not prove that the $18 million figure is more fair, cf. *Lima v. Vouis*, 94 Cal. Rptr. 3d 183, 197 (Ct. App. 2009) (noting trial court should make allocation using "fair and equitable methodology"), nor did it carry its burden in demonstrating that the figure is accurate.[5] In light of those problems, we conclude that discounting is unwarranted, and that the trial court did not err.

---

[5] Without delving deeply into New York law, a cursory reading of the Court of Claims' C.P.L.R. Article 50-B judgment suggests that the State's $18 million figure may be flawed, since the court evaluated the present value of the future damages

## II.

¶ 18. The next issue is whether the trial court erred in allowing the State to assert its lien against all medical expenses beyond those which were paid by Medicaid. Doe illustrates the point with an example: if he received three shifts of nursing care and Medicaid paid for one of those shifts, while Doe paid for the other two, he argues that the State cannot assert its lien against the portion of the settlement representing compensation for the two shifts paid for by Doe.

¶ 19. Doe acknowledges in his cross-appeal that post-*Ahlborn* there has been some controversy over whether a state can recover against sums awarded for all past medicals, or whether a state is limited to recovery from sums awarded for Medicaid-related expenses. The thrust of *Ahlborn*, Doe argues, is that Medicaid recovery is limited to sums received as compensation for care and services paid by Medicaid, and not all medical expenses. Instead of using the $1.3 million figure, which the court found to be all medical expenses incurred following the first settlement, Doe argues that the court should have used the $771,111 figure, which was the medical expenses paid by Medicaid between the first and second settlements. This calculation would have resulted in the State recovering a smaller judgment. The State contests Doe's interpretation of federal law, and where Doe relies on state law, it contends that such arguments are waived because Doe relied exclusively on *Ahlborn* and federal law in the trial court.

¶ 20. The trial court held that Doe's proposed calculation suffers from the problem that it "assum[es] that the pool of funds available to satisfy the State's lien is limited to the sum the State paid between [the two settlements]." The court cited *Ahlborn*, which stated that 42 U.S.C. § 1396k(b), the assignment provision, requires "that the State be paid first out of any damages representing payments for medical care before the recipient can recover any of her own costs for medical care." 547 U.S. at 282. The court therefore did not consider the fact that the State did not pay all of Doe's medical expenses.

¶ 21. First we look to federal law and briefly review *Ahlborn* and the statutory scheme. The reimbursement provision requires

_____

award under 50-B and arrived at a much larger discounted figure than does the State.

that, where a state provides medical assistance to the recipient, the state will seek reimbursement to the extent that payments for care and services have been made available under Medicaid. 42 U.S.C. § 1396a(a)(25)(A)-(B); *Ahlborn*, 547 U.S. at 280. We will assume that the reimbursement provision is an exception to the general rule contained in the anti-lien provision, which prohibits liens from being imposed against a recipient's property "on account of medical assistance paid or to be paid on his behalf under the State plan." 42 U.S.C. § 1396p(a)(1); *Ahlborn*, 547 U.S. at 284-85.[6] *Ahlborn* did not directly address the present issue. The Court did not give specific guidance on what happens when total past medical expenses exceed those paid by Medicaid, as in this case, where Doe paid some of his own medical bills. It did, however, interpret the requirement that states "seek reimbursement for [medical] assistance *to the extent of such legal liability*" to mean "the legal liability of third parties . . . *to pay for care and services available under the plan*." 547 U.S. at 280 (citing 42 U.S.C. § 1396a(a)(25)(A)-(B)). The Court also held that the assignment provision requires that "the [s]tate be paid first out of any damages representing payments for medical care before the recipient can recover any of her own costs for medical care." *Id.* at 282 (citing 42 U.S.C. § 1396k(b)).

¶ 22. Although it appears at first blush that § 1396k settles the matter because it requires that the state be paid first before the recipient recovers any of her own costs for medical care, we doubt its applicability because by its plain terms it governs assignments only, a situation not present here. Rather, in this case, the State sought to recover on its lien against funds obtained by Doe. See *Ahlborn*, 547 at 281 (merely assuming for sake of argument that § 1396k applies where state does not actively participate in litigation to obtain recovery from third party).

¶ 23. Based on the prerevision Vermont statute, we conclude that Doe's argument is the better of the two.[7] Vermont's reimbursement statute — now amended — provided at the time of the

---

[6] We make this assumption because Doe does not argue that all encumbrances against his settlement are prohibited by the anti-lien provision.

[7] As an initial matter, the State's claim that Doe waived any argument under Vermont's statute is incorrect; Doe merely argued that the State's interpretation of the state statute violates *Ahlborn*.

suit that "[t]he agency shall have a lien against a third party, to the extent of the amount paid by the agency, on any recovery for that claim, whether by judgment, compromise or settlement." 33 V.S.A. § 1910(a) (2001) (amended 2008). Thus, § 1910 allows the State to assert its lien only insofar as the State has made payments to the recipient. 33 V.S.A. § 1910(a) (2001) (amended 2008). After a settlement, the State is limited to the portion of the settlement representing "the amount paid by the agency." *Id.* By its plain language, the pre-2008 statute does not allow the State to assert a lien against any recovery for money not paid by Medicaid, as the State did here.[8] We express no opinion on the meaning of the statute following the 2008 revisions and additions.

## III.

¶ 24. Doe also contends that the trial court erred in refusing to allocate to the State a portion of attorney's fees incurred in procuring the 2006 settlement. He argues that the court should have subtracted attorney's fees from the total amount of expenses paid by Medicaid. He points to OVHA's Medicaid Third Party Liability (TPL) Worksheet, which leaves a blank spot for attorney's fees incurred in procuring a tort judgment, and the State's motion for summary judgment, which states that when OVHA recovers money from a settlement, the recipient's attorney "may withhold OVHA's proportionate share of the attorney fees, costs and expenses incurred in asserting the claim."

¶ 25. After the court's summary judgment decision, Doe moved to alter the ruling on the ground that the award should have been reduced by reasonable attorney's fees and costs. The court reduced the State's lien by its share of reasonably necessary costs and expenses, but did not subtract attorney's fees from the State's lien because it concluded that the relevant statute in effect when the case arose provided that only a pro rata share of costs and expenses could be withheld from recovery. The court noted that, as to attorney's fees, the statute provided only that the recipient's

---

[8] The State argues that a remand is necessary to determine whether any portion of Doe's recovery was based on amounts that were billed, but not paid, by medical providers. Doe contends that the amount of benefits paid by Medicaid and the amount of past medicals awarded by the Court of Claims are known and the State did not appeal those figures. Assuming that the argument was sufficiently preserved, we conclude that the argument is foreclosed by our holding that the State may recover only against Medicaid's actual payments.

attorney "may negotiate an attorney fee" with the State. 33 V.S.A. § 1910(j) (2001) (amended 2008). Although the statute was later amended to provide that the recipient's attorney "may withhold the agency's pro rata share of reasonably necessary attorneys' fees, costs, and expenses incurred in asserting the claim," the court concluded that the statute was a change, not a clarification, and therefore inapplicable to the present case. *Id.* § 1910(k). Doe does not contest the applicability of the past version of the statute.

¶ 26. "We presume that the Legislature intended to change the meaning of a statute when it amends it, but we will recognize clarification of the law where the circumstances clearly indicate it was intended." *State v. Thompson*, 174 Vt. 172, 178, 807 A.2d 454, 460 (2002). In general, trial courts have wide discretion in awarding attorney's fees. *L'Esperance v. Benware*, 2003 VT 43, ¶ 21, 175 Vt. 292, 830 A.2d 675. Parties typically must bear their own costs of litigation, absent authority that provides otherwise. *Id.*

¶ 27. We agree that the statute was a change and not a clarification, though we conclude that the State's lien should have been reduced to account for attorney's fees. The statute in place at the relevant time, providing that the attorney for the recipient "may negotiate an attorney fee with the agency," indicated that where the recipient and the State independently made an allocation to recover medical expenses, the parties could discuss deducting attorney's fees from the State's lien. See 33 V.S.A. § 1910(j) (2001) (amended 2008). The statute did not, however, put limits on a court's authority to reduce the State's lien by subtracting attorney's fees where the court is making an allocation. Here, the State was not involved with the litigation in the New York Court of Claims, nor with obtaining the settlement against the NYSTA. Instead, the State asserted a lien against the "fruits of [the] suit once they materialized," but did not expend its own resources in pursuing litigation or settlement. *Ahlborn*, 547 U.S. at 286.[9]

---

[9] The statutory scheme clearly permits — even favors — this method whereby the recipient's attorney litigates the claim against the third party. See 33 V.S.A. § 1910(i) (allowing State to file suit against third party tortfeasor only if specific requirements are met). Nevertheless, the statute does not place limits on the

¶ 28. The record reflects that it was the State's practice to reduce its lien claims by a proportionate share of attorney's fees. The State's motion for summary judgment references Medicare regulations, and asserts that OVHA, like Medicare, is authorized to "absorb a proportionate share of the necessary procurement costs incurred in obtaining the injured person's settlement." (Citing 42 C.F.R. § 411.37.) Indeed, the TPL Worksheet, which leaves a spot for reduction in the amount of attorney's fees, provides that it was "developed in accordance to 42 C.F.R. § 411.37." Normally, courts give deference to an agency's interpretation of a statute that it is charged to administer. See *State v. Int'l Collection Serv., Inc.*, 156 Vt. 540, 545-46, 594 A.2d 426, 430 (1991). Once Doe initiated negotiations pursuant to § 1910(j), the State was required to negotiate in good faith and in accordance with this general practice. The trial court failed to take into account the State's practice, and therefore abused its discretion in denying Doe's request to reduce the State's judgment in the amount of reasonable attorney's fees.

## IV.

¶ 29. Doe's final argument is that the trial court should have reopened the payment from the 2001 settlement because the State was overpaid. Doe argues that it is appropriate to compare the State's combined expenditures to the combined value of the 2001 and 2006 settlements. In doing so, Doe reaches a figure that is less than the State received from the first settlement alone. Doe thus argues that the State should receive nothing more from the second settlement, and should in fact refund to Doe the overpayment of approximately $70,000. The State contends that Doe cannot reopen the 2001 settlement because it preceded *Ahlborn*, the State released its potential claims against the third party tortfeasors, and Doe is barred by the doctrine of laches.

¶ 30. The trial court refused to reconsider the State's payment from the pre-*Ahlborn* 2001 settlement. The court concluded that there was an accord and satisfaction because the claim was disputed, and "in exchange for the State's agreement not to seek further sums from the settling defendants in the New York Supreme Court action, [Doe] paid the State $594,209.03." The

State's ability to enter into settlement negotiations between the recipient and the third party tortfeasor. Here, the State could have done so.

court noted that an accord and satisfaction requires three things: "(1) the claim is disputed; (2) the party offered to pay less than the amount allegedly due; and (3) in full settlement of the claim, the other party accepted and retained the lesser amount offered." *Roy v. Mugford*, 161 Vt. 501, 513, 642 A.2d 688, 695 (1994). The court said that the amount paid to the State was "technically" not less than the amount allegedly due, but equal to the amount due. It nevertheless concluded that there was an accord and satisfaction because the State agreed not to seek further sums from the tortfeasors, if Doe agreed to pay the State its full asserted lien.

¶ 31. Doe points us to a California Court of Appeals case in which the court held that it had jurisdiction to refund the plaintiff's overpayment to the state. See *Branson v. Sharp Healthcare, Inc.*, 123 Cal. Rptr. 3d 462 (Ct. App. 2011). In *Branson*, the plaintiff settled with two of the defendants in 2007 and paid the state its requested lien in full. *Id.* at 465. The state, however, sent the plaintiff a letter stating that because of "the possibility of additional settlements, this reimbursement amount will only be considered as partial satisfaction of the . . . lien." *Id.* In November 2008, when the plaintiff settled with the remaining defendants, the state asserted a lien against a portion of the settlement. *Id.* The plaintiff objected on the grounds that the state was overpaid since he recovered only 23% of his total damages and the state recovered more than its share in the first settlement. *Id.* The court held that the state's statutory scheme allowed the court to order a refund of an overpayment. *Id.* at 468. It also concluded that the first payment to the state was not the result of a negotiated settlement because the parties understood the "fluid nature of the matter" and because they did not agree that his payment was not subject to later adjustment. *Id.* at 469-70.

¶ 32. We do not find *Branson* persuasive because, in that case, the first payment to the state in partial satisfaction of its lien occurred after *Ahlborn* was decided. The present case is more like *Paopao v. Washington*, in which the court held that *Ahlborn* does not apply retroactively where the plaintiff negotiated a resolution of the state's lien six months before *Ahlborn* was decided. 185 P.3d 640 (Wash. Ct. App. 2008). There, the parties agreed that the plaintiff's payment to the state represented "full and final payment in settlement of all sums owing to date *in full accord and satisfaction* of all monies owed." *Id.* at 644. The court concluded that *Ahlborn* could not be used to void her settlement

with the state because only when a matter is still pending is case law given retroactive effect. *Id.* Here, because Doe and the State reached their first settlement many years before *Ahlborn* was decided, Doe cannot rely on *Ahlborn* to argue that the State was overpaid in 2001. See *American Trucking Ass'ns v. Conway*, 152 Vt. 363, 377, 566 A.2d 1323, 1332 (1989) (judicial decisions apply retroactively to cases pending on review).

¶ 33. *Branson* may also be distinguished on the ground that here the nature of the matter was not "fluid" because the parties agreed that the payment by Doe satisfied the State's lien. At first, the parties haggled over a settlement amount. The State had spent $894,893.11 for Doe's medical care by the time of the 2001 settlement. Doe offered to settle the State's lien for $500,000, which the State rejected. Doe then offered to settle with the State for $594,209.03, which he arrived at by subtracting procurement costs from the State's total lien. The letters between Doe and the State confirm that the State accepted "the sum of $594,209.03 *in full satisfaction* of its Medicaid reimbursement for sums paid to or on behalf of [Doe] through June 22, 2001." (Emphasis added.) The State also said that the sum satisfied its lien against Doe's settlement money with the third party defendants, but noted that it did not "satisfy any additional liens which the State may have against settlements or judgments that [Doe] may secure against the remaining defendants."

¶ 34. The parties' agreement thus resolved the issues surrounding the State's lien on Doe's first settlement, while leaving open the possibility that Doe would obtain a judgment against or settlement with the NYSTA. The State reserved the right to encumber a portion of any future judgments or settlements, but there is no indication that the parties intended for the 2001 settlement to remain open-ended. On these facts, we agree with the trial court that there was an accord and satisfaction: (1) the claim was disputed; (2) Doe offered to pay less than the amount allegedly due — $594,209.03 instead of $894,893.11; and (3) in full settlement of the claim, the State accepted $594,209.03.

*Reversed and remanded to recalculate the State's lien against $771,111 in medical expenses and to deduct reasonable attorney's fees; affirmed in all other respects.*